**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-00188-NYW-CYC

MICHELE DIPIETRO,

      Plaintiff,

v.

CITY OF LOVELAND, COLORADO,
MOSES GARCIA, in his individual and official capacities,
VINCENT JUNGLAS, in his individual and official capacities,
JULIA HOLLAND, in her individual and official capacities,
KAREN REES, in her individual and official capacities, and
STEPHEN C. ADAMS, in his individual and official capacities,

      Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter comes before the Court on the Motion to Dismiss Amended Complaint ("Motion to Dismiss" or "Motion"). [Doc. 32]. The Motion was filed on May 1, 2024 by Defendants City of Loveland, Colorado; City Attorney Moses Garcia; Deputy City Attorney Vincent Junglas; Human Resources Director Julia Holland; Human Resources Manager Karen Rees; and City Manager Stephen C. Adams (collectively, "Defendants"). Plaintiff Michele DiPietro ("Plaintiff" or "Ms. DiPietro") has responded in opposition, [Doc. 33], and Defendants have replied, [Doc. 34]. The Court finds that oral argument would not materially assist in the disposition of the Motion to Dismiss. Upon review of the Motion and the related briefing, the applicable case law, and the entire docket, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

The following facts are drawn from the operative Amended Verified Complaint and Jury Demand ("Amended Complaint"), [Doc. 21], and the Court accepts them as true for purposes of the Motion.  Ms. DiPietro brings this civil action against Defendants for alleged violations of her federal constitutional rights and conspiracy to commit the same. *See generally* [*id.*].

This case arises out of Plaintiff's employment with the City of Loveland (the "City"). Ms. DiPietro worked as a paralegal for the City Attorney's Office from August 19, 2020 to September 27, 2021.  [*Id.* at ¶¶ 14, 105–118; Doc. 19-3 at 3–4].[1]  For approximately the first seven months of Plaintiff's employment, she alleges that she worked from home either four or five days per week due to the COVID-19 pandemic.  [Doc. 21 at ¶¶ 17–19]. Ms. DiPietro alleges that, on July 9, 2021, the City implemented a new remote work policy requiring all staff members to work from the City office at least three days per week.  [*Id.* at ¶¶ 28–29, 32–33].  When this policy took effect, Ms. DiPietro alleges that she sought an accommodation under the Americans with Disabilities Act ("ADA") for an additional day of remote work per week.  [*Id.* at ¶¶ 34–35].  Ms. DiPietro alleges that this accommodation was necessary based on the location of her workspace in a busy area

---

[1] In support of their Motion to Dismiss, Defendants rely, in part, on an email identified in ¶ 171 of the Amended Complaint, and the City's Response to Ms. DiPietro's unemployment claim.  [Doc. 32 at 3 n.3].  Plaintiff does not dispute such documents outside of the four corners of the Amended Complaint may be considered in adjudicating this Motion without converting it to one for summary judgment; indeed, Ms. DiPietro invokes the same documents.  [Doc. 33 at 10].  The Court therefore considers the email exchange and personnel file in [Doc. 19-3] and the email and attachment in [Doc. 19-1] without converting Defendants' Rule 12(b)(6) motion into a summary judgment motion because they are referenced in the Amended Complaint and central to Plaintiff's claims. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

with a customer service window, which exacerbated an unspecified disability that limits Ms. DiPietro's ability to maintain focus. [*Id.* at ¶¶ 24–25, 44]. Both her initial accommodation request and an interim request were allegedly denied by Defendant Moses Garcia ("Defendant Garcia") and Defendant Vincent Junglas ("Defendant Junglas"), respectively. [*Id.* at ¶¶ 36, 45]. While Defendant Junglas approved Ms. DiPietro's third accommodation request, Ms. DiPietro alleges that Defendants Junglas and Garcia promulgated a "preliminary guidance" that required her to provide "customer service and office coverage" one day per week for the City Manager's Office. [*Id.* at ¶¶ 48–49]; *see also* [*id.* at ¶ 77]. Plaintiff alleges that she complained to Defendant Junglas that these duties were outside her job description and conflicted with her accommodation. [*Id.* at ¶¶ 56–57].

On August 19, 2021, Ms. DiPietro alleges that she received a formal written warning for "threatening insubordination." [*Id.* at ¶ 76]. Defendant Junglas allegedly informed Ms. DiPietro that Defendant Garcia had directed him to issue the warning. [*Id.* at ¶ 74]. In the warning, Defendant Junglas asserted that the schedule requiring Ms. DiPietro to assist with office coverage on a designated day was lawful, and that Ms. DiPietro's failure to comply with the schedule could result in discipline. [*Id.* at ¶ 76].

Around this time, Ms. DiPietro alleges that she also began seeking a "reclassification" of her position that would grant her a pay raise. *See* [*id.* at ¶¶ 83–90]. Defendants Junglas and Garcia allegedly supported this request at first. [*Id.* at ¶¶ 83–84]. Ms. DiPietro conducted her own research through the City's intranet and learned that her position had been lowered a paygrade before she was hired. [*Id.* at ¶ 87]. She alleges that she contacted Defendant Junglas, Defendant Julia Holland ("Defendant

Holland"), and Defendant Karen Rees ("Defendant Rees") to initiate the reclassification process.  [*Id.* at ¶¶ 88–89].

Following Ms. DiPietro's objections to the office coverage schedule, however, Defendant Garcia allegedly began exhibiting "mounting hostility" toward her.  [*Id.* at ¶ 94].  Ms. DiPietro alleges that Defendant Junglas told her that Defendant Garcia had compared her unfavorably to a prior paralegal and attributed Ms. DiPietro's working overtime to an "inability to prioritize and manage time."  [*Id.* at ¶¶ 91, 93].  Ms. DiPietro alleges that, on September 18, 2021, she requested a meeting with Defendant Garcia to discuss her job and the possibility of hiring additional support staff.  [*Id.* at ¶ 95].  Defendant Garcia allegedly declined the meeting.  [*Id.* at ¶ 96].  Instead, Plaintiff alleges, he directed her to meet with Defendant Junglas.  [*Id.*].  On September 22, 2021, Defendant Junglas allegedly called Ms. DiPietro to inform that Defendant Garcia stated that he would not reclassify her position, grant her a pay raise, or hire additional support staff.  [*Id.* at ¶¶ 100–01].

On September 23, 2021, Defendant Garcia allegedly emailed Defendants Holland and Junglas a list of "talking points" and "guidance" for Defendant Junglas to use in a meeting with Plaintiff.  [*Id.* at ¶ 103; Doc. 19-1].  The talking points note Ms. DiPietro's "[r]esistance to supervision" involving her accommodation, remote work, and assigned office coverage.  [Doc. 19-1 at 2].  They also state that Ms. DiPietro's "[u]nauthorized access" to citywide emails involving payroll information—presumably during her research into reclassification—could require "serious disciplinary action."  [*Id.*].  Plaintiff alleges that the issues described in the talking points document are "pretextual."  [Doc. 21 at ¶ 103].

Plaintiff alleges that, on September 27, 2021, Defendant Junglas informed her that

he would be modifying Plaintiff's accommodation "in accordance with the expectations of the City Manager's Office." [*Id.* at ¶ 108]. Defendant Junglas allegedly also told Ms. DiPietro that she might receive disciplinary action based on evidence received by Defendant Garcia. [*Id.* at ¶ 113]. At 4:01 p.m., Ms. DiPietro sent Defendant Junglas an email stating that she would submit a resignation letter on the next day she was scheduled to work. [*Id.* at ¶ 114; Doc. 19-3 at 4]. Approximately an hour later, Ms. DiPietro alleges, she lost access to the City's network, her work email, and the City's payroll and employee records platform. [Doc. 21 at ¶ 116]. Defendant Junglas then sent her an email accepting her resignation. [*Id.* at ¶ 117; Doc. 19-3 at 3–4]. Ms. DiPietro alleges that this email amounted to a termination that was "involuntar[y] and without cause." [Doc. 21 at ¶ 118].

Ms. DiPietro alleges that, after her employment ended, the Parties' efforts to reach a release agreement failed. [*Id.* at ¶¶ 121–126, 144–147, 158]. She alleges that she complained to Defendant Holland that she had suffered discrimination and retaliation. [*Id.* at ¶¶ 130–33]. Sometime around September 30, Defendants Junglas and Holland allegedly determined that the City would list in Plaintiff's personnel file that she had voluntarily resigned on October 1, 2021 for "personal reasons." [*Id.* at ¶ 139]. Ms. DiPietro alleges that she filed a claim for unemployment benefits with the Colorado Department of Labor and Employment ("CDLE") on October 23, 2021. [*Id.* at ¶¶ 156–157]. Ms. DiPietro alleges that she indicated to CDLE that she had been involuntarily terminated, but Defendant Holland directed a subordinate to indicate that Ms. DiPietro had voluntarily resigned. [*Id.* at ¶¶ 157, 159–61; *see also* [Doc. 19-3 at 1]. Ms. DiPietro also alleges that she initiated a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), but the exact timeline of the EEOC proceeding is

5

unclear.  *See* [Doc. 21 at ¶¶ 167–69].

On January 27, 2022, CDLE allegedly disqualified Ms. DiPietro from receiving unemployment benefits due to the City's assertion that she had voluntarily resigned.  [*Id.* at ¶ 163].  However, the City declined to contest Ms. DiPietro's appeal of the CDLE's disqualification decision.  [*Id.* at ¶ 178].  On May 27, 2022, the CDLE Appeals Branch determined that Ms. DiPietro was entitled to unemployment benefits because the City had created "unsatisfactory working conditions" that caused Ms. DiPietro to resign.  [*Id.* at ¶ 170; Doc. 21-1 at 3].

Plaintiff initiated this lawsuit on January 23, 2024.  [Doc. 1].  Her Amended Complaint, [Doc. 21], brings four claims:  (1) Interference with a Federally Protected Property Interest under 42 U.S.C. § 1983 ("Count One"), [*id.* at ¶¶ 179–90]; (2) Conspiracy to Interfere with a Federally Protected Property Interest under 42 U.S.C. § 1985 ("Count Two"), [*id.* at ¶¶ 191–97]; (3) Interference with a Federally Protected Liberty Interest in Good Name and Reputation under § 1983 ("Count Three"), [*id.* at ¶¶ 198–214]; and (4) Conspiracy to Interfere with a Federally Protected Liberty Interest under § 1985 ("Count Four"), [*id.* at ¶¶ 215–19].  Counts One through Three are against all Defendants in their individual and official capacities,[2] while Count Four is asserted against Defendants Garcia, Junglas, Holland, and Rees, in their individual and official capacities.  *See* [*id.* at ¶¶ 179–219].

On May 1, 2024, Defendants filed the instant Motion, asserting that the Defendants

---

[2] "An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998).  Therefore, insofar as Plaintiff has asserted Count Four against Defendants Garcia, Junglas, and Rees in their official capacities, she has *de facto* sued the City as well.

sued in their individual capacities are entitled qualified immunity and arguing that all four claims should be dismissed under Rule 12(b)(6). *See generally* [Doc. 32]. The Parties have fully briefed the issues, *see generally* [Doc. 33; Doc. 34], and the Court considers the respective arguments below.

## LEGAL STANDARD

### I.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible." (quotation omitted)). The Court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## II.    Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A motion to dismiss based on qualified immunity creates a presumption of immunity, *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (citation omitted), and the burden shifts to the plaintiff to overcome this presumption, *Hunt v. Montano*, 39 F.4th 1270, 1284 (10th Cir. 2022).  To rebut an assertion of qualified immunity, a plaintiff must establish "(1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct."  *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation and quotation omitted).

A right is clearly established if there is a decision by the Supreme Court or U.S. Court of Appeals for the Tenth Circuit ("Tenth Circuit") on point or if the weight of authority in other courts provides that the right is clearly established.  *See DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001).  A case is considered "on point" if it involves materially similar conduct to the case at hand or applies "with obvious clarity" to the conduct at issue. *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (cleaned up).  Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (defining inquiry as whether "state of the law" at the time of alleged violation gave defendants "fair warning" that their conduct was unconstitutional).

**ANALYSIS**

**I.    Count One:  Interference with a Federally Protected Property Interest**

Count One asserts a claim under 42 U.S.C. § 1983 and alleges that Defendants interfered with Plaintiff's property interest in receiving unemployment benefits.  [Doc. 21 at ¶¶ 179–90].  Defendants argue that Count One should be dismissed because Plaintiff fails to adequately allege that unemployment benefits are a protected property interest. [Doc. 32 at 6–7].  Defendants raise this argument in the context of a qualified immunity analysis, [*id.*], which necessarily affects only the Defendants sued in their individual capacities, *see, e.g.*, *Cox v. Glanz*, 800 F.3d 1231, 1239 n.1 (10th Cir. 2015).  But the question of whether Plaintiff has alleged a violation of a federal right implicates the viability of Count One as a whole, because § 1983 provides a cause of action only for violations of federal constitutional and statutory rights.  *See* § 1983 (authorizing private suit for a "deprivation of any [federal] rights, privileges, or immunities secured by the Constitution and laws"); *see also Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) (holding that "a claim under § 1983 against . . . a municipality cannot survive a determination that there has been no constitutional violation").  Thus, this Court focuses on the first prong of the qualified immunity analysis and looks to whether the facts alleged by Plaintiff make out a violation of a federal right.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that a district court may exercise its sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first).

**A.    Violation of a Federal Right**

To state a claim under § 1983, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law*."  *Blessing v. Freestone*, 520 U.S. 329, 340

(1997).  Courts apply a three-factor test when determining whether a federal statute confers a right enforceable under § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.

*Id.* at 340–41 (cleaned up).  With respect to the first requirement, the Supreme Court has clarified that a statutory right must be "unambiguously conferred."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  If the statute contains "merely a vague benefit or interest," it cannot support an action under § 1983.  *Mandy R. ex rel. Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1147 (10th Cir. 2006) (citing *Gonzaga*, 536 U.S. at 283).

Ms. DiPietro identifies several statutes as a basis for Count One.  The Court respectfully finds that none of these suffice to support a § 1983 action.  First, she cites to the Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. §§ 3301–3311, in its entirety, [Doc. 21 at ¶ 180].  But Ms. DiPietro does not allege that Defendants have violated any particular provision of FUTA, let alone point to a section that unambiguously confers an individual right.  Second, she cites to 42 U.S.C. § 503(a)(1), which provides that the Secretary of Labor shall not provide federal funds for state unemployment benefits unless the state law includes "methods of administration . . . reasonably calculated to insure full payment of unemployment compensation."  [Doc. 21 at ¶ 180].  Again, the Court discerns no individual right conferred by this statute, and Ms. DiPietro raises no argument to that effect.  To the extent that Ms. DiPietro enjoys an indirect benefit from this provision, she makes no effort to identify a provision conferring the unambiguous individual right required by *Gonzaga*.  *See Winter v. N.M. Dep't of Workforce Sols.*, Civ. No. 21-cv-00475-

JFR-SCY, 2022 WL 4132740, at *10 & n.11 (D.N.M. Sept. 12, 2022) (dismissing § 1983 claim based on alleged violations of "supplemental employment benefit provisions" of CARES Act where plaintiffs identified no statutory provision creating a private right of action). Third, Ms. DiPietro asserts that "participation in unemployment benefits [i]s a federally protected activity" under 18 U.S.C. § 245(b)(2). [Doc. 21 at ¶ 181]. She also claims that 18 U.S.C. § 246 and 18 U.S.C. § 1001(a)(2) protect her against individuals who make "false statements" that interfere with her receipt of unemployment benefits. [*Id.*; Doc. 33 at 6, 9]. But each of these provisions under Title 18 is a federal criminal statute that does not provide a private right of action. *See, e.g.*, *Clements v. Chapman*, 189 F. App'x 688, 692 (10th Cir. 2006) (upholding dismissal of § 1983 claim based on violation of federal criminal statutes that did not contain a private right of action); *Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*, 61 F. Supp. 3d 704, 711 (N.D. Ohio 2014) (dismissing § 1983 claim and recognizing that "there exists no independent, private cause of action for the alleged violation of 18 U.S.C. § 1001"); *Dugar v. Coughlin*, 613 F. Supp. 849, 852 n.1 (S.D.N.Y. 1985) (recognizing no private rights of action in 18 U.S.C. §§ 245–46 that could sustain a § 1983 claim).

Plaintiff's citations to a bevy of constitutional cases are inapposite. [Doc. 33 at 4]; *see also, e.g.*, *Sherbert v. Verner,* 374 U.S. 398 (1963); *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mathews v. Eldridge*, 424 U.S. 319 (1976). Those cases recognize that an individual's disqualification from statutory entitlements—such as unemployment benefits—may violate the protections of procedural due process, *Goldberg*, 397 U.S. at 262–63, or the Free Exercise Clause, *Sherbert*, 374 U.S. at 403–06. Thus, as in *Goldberg*, a property interest in a statutory entitlement, which may not contain a private

right of action, is safeguarded by enforceable procedural due process rights.  397 U.S. at 262–63.  But Ms. DiPietro fails to allege that she did not receive the procedure to which she may have been entitled in her application for unemployment benefits.  Count One focuses only on the disruption of the underlying entitlement without alleging a violation of a federal right within the meaning of § 1983 and *Gonzaga*.  *See generally* [Doc. 21 at ¶¶ 179–90].  And for purposes of the Motion, the Court cannot consider the belated allegations in the Response that attempt to convert Count One into a procedural due process claim.  [Doc. 33 at 6–7]; *see also Mobley v. McCormack*, 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.").  This is particularly true given the fact that Plaintiff has been represented by counsel since the inception of this action.  *See Alsamir v. U.S. Citizenship & Immigr. Servs.*, No. 06-cv-01751-WDM-BNB, 2007 WL 1430179, at *1 (D. Colo. May 14, 2007) (observing that because the plaintiffs were represented by counsel, they were not entitled to liberal construction of their pleadings).

Because Ms. DiPietro fails to allege that Defendants violated a federal right, the Court's analysis need not proceed beyond this threshold requirement for a § 1983 claim.  The Court does not consider the remaining two prongs of the *Blessing* test, nor does it reach the Parties' other qualified immunity arguments.  Count One is respectfully **DISMISSED without prejudice**.

## II.    Counts Two and Four:  Civil Rights Conspiracy under § 1985(3)

Count Two alleges that Defendants conspired to interfere with Ms. DiPietro's "participat[ion] in federally-protected unemployment benefits."  [Doc. 21 at ¶ 192].  In

short, Ms. DiPietro alleges that the conspiracy consisted of an agreement to submit a false report to CDLE that she voluntarily resigned while omitting information regarding her ADA accommodation.  [*Id.* at ¶ 193].  Count Four alleges that Defendants conspired to make and spread false statements that tarnished Ms. DiPietro's good name and professional reputation.  *See* [*id.* at ¶¶ 215–19].  Ms. DiPietro brings these claims under 42 U.S.C. § 1985(3), which provides a cause of action for conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

"The essential elements of a § 1985(3) claim are:  (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom."  *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)).  But the Supreme Court has clarified that § 1985(3) does not "apply to all tortious, conspiratorial interferences with the rights of others."  *Griffin*, 403 U.S. at 101.  Instead, a plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  *Id.* at 102.  And because *Griffin* contemplated only a "speculative extension of § 1985(3)" beyond racially discriminatory conspiracies, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993), subsequent decisions have "narrowly construed" the scope of class-based animus that may support a § 1985(3) action, *Tilton*, 6 F.3d at 686 (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 837 (1983)).

Ms. DiPietro does not allege in Count Two or Count Four that Defendants entered a conspiracy motivated by a discriminatory, class-based animus.  At some points in the

Amended Complaint, she suggests that other actions by Defendants amounted to discrimination based on her disability. *See, e.g.*, [Doc. 21 at ¶¶ 70, 130–33]. However, even if Plaintiff did allege that Defendants entered a conspiracy due to a discriminatory animus against her disability status—and to be clear, she makes no such allegation—Counts Two and Four would still fail. The Tenth Circuit has held that allegations of discrimination based on disability status cannot sustain a § 1985(3) claim. *Wilhelm v. Cont'l Title Co.*, 720 F.2d 1173, 1176–77 (10th Cir. 1983) (holding that physical disability is not a class for purposes of § 1985(3)); *Phibbs ex rel. Phibbs v. Am. Prop. Mgmt.*, 60 F. App'x 738, 740 (10th Cir. 2003) (reaffirming *Wilhelm*); *see also Hall v. Doering*, 997 F. Supp. 1445, 1452 (D. Kan. 1998) ("The disabled are not a class for the purposes of Section 1985."); *McMullin v. Ashcroft*, 337 F. Supp. 2d 1281, 1291–92 (D. Wyo. 2004) (applying *Wilhelm* and *Phibbs* and granting judgment on the pleadings against federal employee suffering from mental disability). Accordingly, Plaintiff fails to state plausible claims for civil rights conspiracy under § 1985(3), and the Court need not reach the remaining elements of those claims. And because binding Tenth Circuit precedent forecloses § 1985(3) claims alleging discrimination based on disability, the Court finds that amendment of Counts Two and Four would be futile. *See Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (observing that dismissal with prejudice is appropriate when amendment is futile). Counts Two and Four are therefore respectfully **DISMISSED with prejudice**.

### III.    Count Three:  Interference with a Federally Protected Liberty Interest

Count Three brings a § 1983 claim for Defendants' alleged failure to provide adequate process to protect Ms. DiPietro's liberty interest in her professional reputation.

14

[Doc. 21 at ¶¶ 198–214]. Ms. DiPietro alleges that Defendants terminated her based on an allegation that she accessed without authorization "citywide emails that discuss and set forth payroll information." [*Id.* at ¶ 204]. She alleges that Defendants neither informed her of this allegation nor extended an opportunity for response or appeal. [*Id.* at ¶ 203–05]. Ms. DiPietro alleges that these allegations "foreclosed other employment opportunities . . . because the Defendants published those false statements to other City employees and officials, employees and officials of other Colorado government entities and attorneys and other legal professionals employed in Colorado's private sector." [*Id.* at ¶ 209]. Defendants argue that the Defendants sued in their individual capacities are entitled to qualified immunity, and that Count Three fails to state a claim against the official capacity Defendants and City.

### A.    Stigma-Plus Claim

Although Plaintiff does not label Count Three as a due process claim, she alleges that Defendants failed to afford Plaintiff adequate process in taking actions that infringed a protected liberty interest. [*Id.* at ¶¶ 207–09]. Specifically, Plaintiff alleges that Defendants at various times repeated accusations that she gained unauthorized access to City emails regarding payroll information. [*Id.* at ¶¶ 204–07]. Ms. DiPietro contends that these statements interfered with her liberty interests in her professional reputation and ability to seek other employment. [*Id.* at ¶¶ 207–09]; *see also, e.g.*, *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir. 1983).

This is, in effect, a "stigma-plus" claim for governmental defamation. *See Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012). To adequately allege a stigma-plus claim, a plaintiff must allege both that the government made defamatory statements and

that the defamation accompanied a "change of legal status." *Id.*; *see also Paul v. Davis*, 424 U.S. 693, 701 (1976) (holding that "reputation alone, apart from some more tangible interests such as employment" is not "liberty" or "property" within the meaning of the Due Process Clause). Courts in the Tenth Circuit apply a four-part test for determining whether an employer has infringed an employee's liberty interests in their professional reputation and ability to seek other employment opportunities. *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994). A plaintiff challenging an employer's allegedly defamatory statements must show that: (1) the statements impugned the good name, reputation, honor, or integrity of the employee; (2) the statements were false; (3) the statements occurred in the course of terminating the employee or foreclosed other employment opportunities; and (4) the statements were published. *Id.* The Tenth Circuit has further explained that the "third element should have been phrased conjunctively: the statement must occur in the course of terminating the employee *and* must foreclose other employment opportunities." *Castillo v. Hobbs Mun. Sch. Bd.*, 315 F. App'x 693, 697 (10th Cir. 2009) (citing *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 728 n.1 (10th Cir. 2000)).

The Court discerns four possible instances of defamation alleged in Ms. DiPietro's Amended Complaint: (1) submissions to CDLE in connection with Ms. DiPietro's claim for unemployment benefits, as directed by Defendants Holland and Rees, [Doc. 21 at ¶¶ 160–61]; (2) statements to the EEOC in the City's response to Ms. DiPietro's charge of discrimination, [*Id.* at ¶¶ 167–68, 171–74]; (3) statements by Defendants Garcia and Junglas to "other City employees and officials," [*id.* at ¶ 175]; and (4) an anonymous comment on a Facebook page associated with the City, [*id.* at ¶ 176]. In the Motion,

Defendants generally do not dispute that Ms. DiPietro has adequately pled the first two elements of a stigma-plus claim. *See generally* [Doc. 32]. The Court therefore focuses on whether each of the possible defamatory statements satisfy the third and fourth elements of a stigma-plus claim.

The third element of a stigma-plus claim requires that a defamatory statement is made during the course of termination and forecloses other employment opportunities. *Castillo*, 315 F. App'x at 697. Relevant here, the Tenth Circuit has clarified that a defamatory statement "need not be strictly contemporaneous with a termination." *Renaud*, 203 F.3d at 727. Instead, the relevant inquiry is the manner of termination and the "statements made incident to the termination." *Id.* (cleaned up) (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)). Courts therefore "examine both the nature and the timing of an allegedly defamatory statement to determine whether it has been made in the course of an employee's termination." *Id.*

Publication is the fourth and final element of a stigma-plus claim. *Workman*, 32 F.3d at 481. For a statement to be published, it must be "made public." *Bishop v. Wood*, 426 U.S. 341, 348 (1976); *see also Six v. Henry*, 42 F.3d 582, 585 (10th Cir. 1994) (finding no publication where there was no "public pronouncement" of stigmatizing information). But "intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication." *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984) (citing *Bishop*, 426 U.S. at 348) (holding that statements disseminated only within state government were not published for purposes of stigma-plus claim). Intra-government dissemination includes "the internal communications of the same unit of government, such as a state, city, or agency." *Alcorn v. La Barge*, 784 F. App'x 614, 619

(10th Cir. 2019) (collecting cases).  The Tenth Circuit has also construed intra-government dissemination as "communications across units of government (such as between a city and county) and between a state and its sub-units." *Id.* (holding that communication between municipality and state agency constituted intra-government dissemination).  With this background in mind, the Court considers each of the potentially defamatory statements alleged by Ms. DiPietro.

### 1.    Statements to CDLE

First, the alleged communication to CDLE in connection with Ms. DiPietro's claim for unemployment benefits, [Doc. 21 at ¶¶ 159–60],[3] falls squarely within the definition of intra-governmental dissemination set forth in *Alcorn*, *see* 784 F. App'x at 619 (finding that municipality's communication to state agency disclosing reasons for employee's termination was intra-government dissemination).  Accordingly, any communications by City employees to CDLE were not "published" for purposes of Ms. DiPietro's stigma-plus claim.  The Court therefore need not consider whether this statement was made in the course of Ms. DiPietro's termination.

### 2.    Statements to EEOC

Ms. DiPietro alleges that the City's statements to the EEOC, including "Exhibit T," asserted various stigmatizing "infractions" that she committed during her employment. [Doc. 21 at ¶¶ 167–69, 171–72]; *see also* [Doc. 19-1].  Given that Ms. DiPietro alleges that she received notice of these statements on May 20, 2022, [Doc. 21 at ¶ 167], it

---

[3] Ms. DiPietro does not allege that this communication contained stigmatizing allegations of misconduct, so the City's communication to CDLE could not support a stigma-plus claim even if it were not intra-government dissemination.  *See Workman*, 32 F.3d at 481.

appears that these statements were made approximately eight months after her termination on September 27, 2021, *see* [*id.* at ¶¶ 108, 117].

This eight-month gap in time means that Ms. DiPietro cannot satisfy the third *Workman* element's requirement that a defamatory statement be made in the course of termination. *Workman*, 32 F.3d at 481. The Court is aware of no authority, and Ms. DiPietro provides none, suggesting that an eight-month lapse between an employee's termination and an allegedly defamatory statement can sustain a stigma-plus claim. *See Siegert*, 500 U.S. at 234 (finding that letter written several weeks after termination was not "incident to the termination"); *Tibbetts v. Kulongoski*, 567 F.3d 529, 538 (9th Cir. 2009) (finding that press release published 16 months after termination could not be considered "in the course" of termination (citation omitted)); *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (holding that statement made five months after termination was not made in the course of dismissal); *cf. McDonald v. Wise*, 769 F.3d 1202, 1209, 1212 (10th Cir. 2014) (finding that statement to press made one month after termination was in the course of termination). Moreover, the "nature" of the alleged statement demonstrates that Defendants' statements were prompted by Ms. DiPietro's charge of discrimination, not the termination itself. *Renaud*, 203 F.3d at 727–28. The Court concludes that Ms. DiPietro fails to allege that any statements to the EEOC were made in the course of her termination.

Any defamatory statements to the EEOC additionally cannot satisfy the publication element of a stigma-plus claim. A statement from a state governmental unit to a federal agency is not intra-governmental dissemination as presently defined by the Tenth Circuit. *See Al-Turki v. Tomsic*, No. 15-cv-00524-REB-KLM, 2017 WL 11501099, at *9–10 (D.

Colo. Feb. 28, 2017) ("[T]he Tenth Circuit appears to have left the door open for consideration of whether inter-governmental dissemination could be considered publication."), *report and recommendation adopted*, 2017 WL 11501170 (D. Colo. Mar. 24, 2017).    However, this Court need not decide whether inter-governmental dissemination constitutes publication because, as Defendants point out, the City's statements to the EEOC were non-public.  [Doc. 32 at 12].

While the Court declines Defendants' invitation to import the "privilege" defense from civil defamation suits into the stigma-plus context, *see* [Doc. 32 at 12–13]; *Colaizzi v. Fire Prot. Serv. Corp.*, No. 15-cv-01473-MSK-CBS, 2017 WL 878539, at *6–7 (D. Colo. Jan. 27, 2017), it agrees that Plaintiff fails to allege that the City's statements to the EEOC were "made public," *Bishop*, 426 U.S. at 348.  The statute governing EEOC investigations prohibits a charge of discrimination or "anything said or done" during the EEOC's informal efforts to resolve an alleged discriminatory practice from being "made public."  42 U.S.C. § 2000e-5(b); *cf. Talley v. City of North Las Vegas*, No. 2:22-cv-01115-ART-BNW, 2024 WL 4557289, at *3 (D. Nev. Oct. 22, 2024) ("Statements that are part of an EEOC investigation are confidential.  If neither the EEOC nor the defaming party publishes them, they are not actionable for [civil] defamation." (citation omitted)).  Ms. DiPietro does not allege that Defendants' statements to the EEOC were "anything but confidential." *Sanchez v. Dubois*, 291 F. App'x 187, 191–92 (10th Cir. 2008) (citations omitted) (rejecting stigma-plus claim where stigmatizing information existed in confidential files and plaintiff demonstrated no likelihood that it would be disclosed to future employers). The Court therefore concludes that Ms. DiPietro fails to allege that statements to the EEOC were published for purposes of her stigma-plus claim.

### 3. Statements to Other City Employees and Officials

The third possible defamatory statement is Ms. DiPietro's allegation that, in late 2022, she "learned from a former colleague in the City Attorney's Office that both [Defendants] Garcia and Junglas had published the false allegations of misconduct to other City employees and officials." [Doc. 21 at ¶ 175]. As an initial matter, the Court notes that Ms. DiPietro has failed to allege facts establishing that these statements were made in the course of termination. Ms. DiPietro alleges the time when she learned of the statements but does not specify when Defendants Garcia and Junglas allegedly made these statements to other City officials. [*Id.*]. This distinction is critical because, if Defendants Garcia and Junglas made the allegedly defamatory statements in late 2022, the Court is unconvinced that a roughly one-year lapse between termination and the stigmatizing statements can satisfy the "in the course of termination" requirement. *See supra* Part III.A.2 (collecting cases). Moreover, because Ms. DiPietro provides no further factual allegations as to these statements—such as their content or context—the Court is unable to evaluate the "nature" of the alleged defamation. *See Renaud*, 203 F.3d at 727. On these minimal factual allegations, the Court concludes that these statements by Defendants Garcia and Junglas fail to satisfy the third element of a stigma-plus claim.

With respect to the publication element, it is unclear whether statements from one government official to other government employees constitutes intra-government dissemination. *See generally Howes v. N.M. Dep't of Health*, No. 21-cv-00263-JB-SCY, 2023 WL 1419832, at *77 n.50 (D.N.M. Jan. 31, 2023). "In *Watson v. University of Utah Medical Center*, the Tenth Circuit concludes that evidence that a nurse's 'supervisors made public statements to the entire nursing staff' met the publication requirement." *Id.*

(citing *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 579 (10th Cir. 1996)).  This suggests that the Tenth Circuit did not view the statements to the nursing staff as intra-governmental dissemination.  *Id.*  "In *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986) however, the Tenth Circuit conclude[d] that a statement [regarding a student's performance] was intra-governmental when it was disseminated among some of the program's instructors and administrative personnel, and not to anyone not connected with the program."  *Howes*, 2023 WL 1419832, at *77 n.50 (cleaned up) (quoting *Harris*, 798 F.2d at 421–22 & n.2).  Although the Tenth Circuit has not commented on this tension between *Watson* and *Harris*, this Court agrees with the reasoning in *Howes* that the distinction lies in whether the group receiving the communication "share[s] an interest in the substance of the communication."  *Id.* (quoting *Alcorn*, 784 F. App'x at 619).  The instructors and administrators in *Harris* had a professional interest in being informed of a student's ethical and competency issues, whereas the nurses in *Watson* had only a personal interest in knowing why a former colleague had been terminated.  *Id.* (citing *Harris*, 798 F.2d at 420–21).

Applying this reasoning to Ms. DiPietro's allegation, the Court finds that Ms. DiPietro fails to allege that the government officials and employees who learned the reasons for her termination shared no interest in the substance of the communication. Ms. DiPietro does not explain whether the communication in question had some official purpose or was mere workplace gossip.  *See generally* [Doc. 33].  And she neither identifies which officials received the communication nor specifies precisely what information was communicated.  Her allegation suggests that the communication was directed to specific "other City employees," rather than announced to the entire staff, as

occurred in *Watson*.  *Compare* [Doc. 21 at ¶ 175], *with Watson*, 75 F.3d at 579.  Thus, even taking this vague allegation as true, the Court concludes that Plaintiff fails to plausibly allege that any communications from Defendants Garcia and Junglas to other City officials were actionable non-governmental dissemination.

### 4.    Statements by Anonymous Facebook Accounts

The final alleged publication is an anonymous comment on "a public Facebook page connected to the City in late March 2022 by one or more individuals associated with the City masquerading under a pseudonym, which stated:  'I hope they are able to prove you stole city confidential documents before quitting.'"  [Doc. 21 at ¶ 176].  Defendants do not dispute that this statement was published.  But the Court need not decide whether an anonymous internet comment that Plaintiff broadly attributes to City employees constitutes "publication," because Ms. DiPietro does not allege that this statement was made in the course of her termination.  As explained above, a five-month time gap between termination and a stigmatizing statement exceeds the recognized time periods where a statement may be considered "incident to" or "in the course of" termination. *Compare McDonald*, 769 F.3d at 1209, 1212 (permitting stigma-plus claim based on statements made one month after termination), *and Renaud*, 203 F.3d at 727 (holding that lapse of "several days" between termination and statements did not defeat stigma-plus claim), *with Siegert*, 500 U.S. at 234 (finding that letter written several weeks after termination was not "incident to the termination"), *and Martz*, 22 F.3d at 32 (rejecting stigma-plus claim based on statements made five months after termination).  And unlike *McDonald*, where the mayor made stigmatizing statements at official press conferences regarding the dismissal of his former special assistant, 769 F.3d at 1208–09, 1212, the

"nature" of the alleged communication here appears far less official, *see Renaud*, 203 F.3d at 727–28.  Ms. DiPietro provides no allegation or argument as to how an anonymous Facebook comment relates to the "manner in which a public employee is terminated."  *Id.* at 727 (quotation omitted).  The Court concludes that Ms. DiPietro fails to satisfy the third *Workman* element with respect to this alleged defamatory statement.

Even if Ms. DiPietro could allege that the anonymous Facebook comment was made in the course of her termination, a § 1983 claim against any individual Defendant based on this statement would still fail.  "[I]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (quotation omitted).  For a § 1983 claim against a supervisor, "personal involvement" does not require direct personal participation.  *See id.*  A supervisor's liability for a subordinate's constitutional violation may be based on "his exercise of control or direction, or his failure to supervise, or his knowledge of the violation and acquiescence in its continuance."  *Id.* (cleaned up).  Here, the Court agrees with Defendants that Ms. DiPietro fails to allege any involvement by any individual Defendant in publishing the alleged Facebook comment.  *See* [Doc. 32 at 13].  In fact, the allegation that anyone "associated with the City" posted the Facebook comment is entirely conclusory.  [Doc. 21 at ¶ 176].  In her Response, Ms. DiPietro only repeats this conclusory assertion without raising any substantive counterarguments.  *See* [Doc. 33 at 10].

The Court respectfully concludes that Ms. DiPietro has failed to adequately allege any defamatory statements that satisfy all four *Workman* requirements for a stigma-plus claim.  Because Ms. DiPietro fails to allege that Defendants violated a protected liberty

interest, the Court need not consider whether she received adequate process. As such, Count Three fails with respect to all Defendants,[4] and the Motion is respectfully **GRANTED**. Count Three is respectfully **DISMISSED without prejudice** as to Defendants in their official capacities and **DISMISSED with prejudice** as to Plaintiff's claim against Defendants Garcia, Junglas, Rees, Holland, and Adams in their individual capacities.[5]

### CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)   Defendants' Motion to Dismiss Amended Complaint [Doc. 32] is **GRANTED**;

(2)   Count One is respectfully **DISMISSED without prejudice**;

(3)   Counts Two and Four are respectfully **DISMISSED with prejudice**;

---

[4] Ms. DiPietro does not, and need not, plead municipal liability as a standalone claim. *Cf. Romero v. Bd. of Cnty. Comm'rs*, 202 F.Supp.3d 1223, 1267 (D.N.M. 2016). *See supra* note 2. In the Tenth Circuit, while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023). But here, Ms. DiPietro has failed to allege a cognizable protected liberty interest, and thus, Count Three against the City fails as well. *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) (holding that a municipality may not be held liability without an underlying violation of a protected right by any of its officers).

[5] The Court finds that dismissal with prejudice is appropriate to the extent that Count Three asserts a claim against the individual-capacity Defendants because Plaintiff fails to carry her burden to demonstrate that any of her rights were clearly established at the time of the alleged conduct. *See DeSpain*, 264 F.3d at 979. Plaintiff's Response provides no arguments, and identifies no legal authority, to suggest that it was clearly established that any of the alleged statements violated her protected liberty interests. *See generally* [Doc. 33]. The Court has already determined that Count Three fails to allege a constitutional violation. Thus, because Plaintiff fails to satisfy either prong of the qualified immunity test, the Court concludes that further amendment of Count Three would be futile as to the individual-capacity Defendants. *See Knight*, 749 F.3d at 1190.

(4)    Count Three is respectfully **DISMISSED with prejudice** to the extent it is
asserted against Defendants in their individual capacities;

(5)    Count Three is respectfully **DISMISSED without prejudice** to the extent it
is asserted against Defendants in their official capacities;

(6)    Defendants are awarded their costs pursuant to Local Rule 54.1 and
Federal Rule of Civil Procedure 54; and

(7)    The Clerk of Court is **DIRECTED to TERMINATE** the case.[6]

DATED:  January 14, 2025                     BY THE COURT:

                                             Nina Y. Wang
                                             United States District Judge

---

[6] Although Plaintiff adds new factual allegations in her Response, *see supra* Part I.A, she does not request leave to amend in her Response and has not filed a separate motion seeking amendment after the Motion to Dismiss was filed, *see* [Doc. 33].  In the absence of a request to amend, the district court may dismiss the action, rather than grant sua sponte leave to amend.  *See Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020) (citations omitted) ("When a party faces a motion to dismiss and it believes that it can overcome objections with an amendment to the pleading, it should seek leave to amend at that time.  Efficient adjudication of disputes requires that the party present its best effort to state a claim before the court addresses the motion to dismiss"); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("[A] court need not grant leave to amend when a party fails to file a formal motion.").  Given the fact that the instant Amended Complaint was filed as a matter of right after Defendants' previous motion to dismiss that raised similar issues, *see* [Doc. 18; Doc. 21; Doc. 32], this Court respectfully **DECLINES** to grant sua sponte leave to amend.